## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KRISTI HUNT,                                      *

      Plaintiff,                                *

      v.                                        *          Civil No.: BPG-20-2489

UNITED STATES OF AMERICA,                         *

      Defendant                                 *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### <u>MEMORANDUM OPINION</u>

The above-referenced case was referred to the undersigned for all proceedings with the consent of the parties, pursuant to 28 U.S.C. 636(c) and Local Rule 301.4.  (ECF Nos. 17, 18). Currently pending are defendant's Motion for Summary Judgment ("Motion") (ECF No. 30), defendant's Memorandum in Support of Motion for Summary Judgment (ECF No. 31), defendant's Statement of Facts as to Which There is No Genuine Dispute (ECF No. 32), plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Opposition") (ECF No. 37), and defendant's Reply to Plaintiff's Opposition to Motion for Summary Judgment ("Reply") (ECF No. 38).  No hearing is deemed necessary.  Loc. R. 105.6.  For the reasons discussed herein, defendant's Motion for Summary Judgment (ECF No. 30) is DENIED.

### I.     <u>BACKGROUND</u>

In ruling on a motion for summary judgment, this court considers the facts and draws all reasonable inferences in the light most favorable to the nonmoving party, which is the plaintiff in this case.  <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007).  Plaintiff Kristi Hunt ("plaintiff") allegedly sustained personal injuries on February 23, 2019, when she fell while ice skating at a facility owned

and operated by the Brigade Sports Complex ("the BSC") at the United States Naval Academy, located on the grounds of defendant United States of America ("defendant") in Annapolis, Maryland.  (ECF No. 1-2 at ¶¶ 1, 11).  Plaintiff arrived at the BSC with her boyfriend at the time, Charles Eckholdt ("Mr. Eckholdt"), and her two children, at approximately 5:00 p.m., about 20 minutes after the start of the 4:40 p.m. public skate session.  (ECF Nos. 31 at 3, 37 at 3).  Plaintiff began skating around 5:25 p.m.  (ECF No. 31 at 3).  Plaintiff alleges that at approximately 5:30 p.m., "[s]uddenly and without warning, the blade of [plaintiff's] ice skate became lodged in a deep divot in the ice, causing her skate to stop suddenly, [and] twisting her body," causing her to fall and sustain serious injuries.  (ECF No. 1 at 4 ¶¶ 15-16).  Plaintiff alleges that her son, Evan Hunt, was skating next to her at the time of her fall.  (ECF No. 37 at 7-8).  While plaintiff testified during her deposition that she did not notice any defects in the ice before or after her fall (ECF No. 37-2 at 15-16), her son Evan testified during his deposition that he observed a four-inches long, one-inch wide "crevice" in the ice as he assisted plaintiff after her fall (ECF No. 37-13 at 7).  No BSC employees, however, discovered any defects in the ice and there were no reports made to BSC employees prior to plaintiff's fall of either any defects in the ice or any other skaters falling due to a defect in the ice.  (ECF No. 31 at 12).  After plaintiff was removed from the ice following her fall, BSC employees determined that they did not need to repair the ice, and the public skate session was allowed to resume.  (Id. at 4).

In addition, Sean Woolums ("Mr. Woolums"), BSC's manager-on-duty on the day of the incident, completed a "General Liability Incident Report" following plaintiff's fall.  (ECF No. 37-12).  The report indicates that plaintiff was injured when she "fell on the ice."  (Id.)  The report also notes that "skate guards"—individuals employed by defendant who are responsible for monitoring conditions of the ice and looking for potential hazards—were on the ice at the time of

plaintiff's fall.  (Id.)  Further, while two BSC employees, Kyle Coogan and Erica Rasmussen, were assigned as skate guards on the day of the incident (ECF No. 31 at 2-3), plaintiff alleges that she, Evan Hunt, and Mr. Eckholdt did not observe any skate guards while they were skating.  (ECF No. 37 at 23).  Relatedly, it was defendant's procedure to maintain a Resurfacer Log, which BSC employees used to record each time the ice was resurfaced.[1]  (ECF No. 37-4 at 26-27).

On August 28, 2020, plaintiff filed suit against defendant in this court pursuant to the Federal Tort Claims Act ("FTCA").  (ECF No. 1 at 4 ¶ 13).  Plaintiff states a negligence claim under the FTCA, asserting that BSC employees acted within the scope of their employment with defendant when they failed to properly inspect and maintain the skating rink surface, warn plaintiff of a dangerous condition on the ice, maintain the premises in a safe condition, and properly supervise its patrons.  (Id. at 5 ¶¶ 19-20).  Plaintiff seeks damages in an amount greater than $75,000.  (Id. at 9).  Discovery closed on August 6, 2021, and thereafter, the pending Motion and related pleadings were filed.

## II.    <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute remains "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is properly considered "material" only if it might affect the outcome of the case under the governing law.  Id. The party moving for summary judgment has the burden of demonstrating the absence of any genuine issue of material fact.  Fed. R. Civ. P. 56(a); Pulliam Inv. Co., Inc. v. Cameo Props., 810

---

[1] The ice was scheduled to be resurfaced at 4:30 p.m. on the day of the incident.  (ECF No. 37-3 at 3).  As will be discussed below, however, the parties dispute whether defendant resurfaced the ice at that time.  (See ECF Nos. 31 at 11, 37 at 18-23).

F.2d 1282, 1286 (4th Cir. 1987). On those issues for which the non-moving party will have the burden of proof, however, it is his or her responsibility to oppose the motion for summary judgment with affidavits or other admissible evidence specified in Federal Rule of Civil Procedure 56. Fed. R. Civ. P. 56(c); Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1315-16 (4th Cir. 1993). If a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment is proper. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

When reviewing a motion for summary judgment, the court does not evaluate whether the evidence favors the moving or non-moving party but considers whether a fair-minded factfinder could return a verdict for the non-moving party on the evidence presented. Anderson, 477 U.S. at 252. In undertaking this inquiry, the court views all facts and makes all reasonable inferences in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The non-moving party, however, may not rest on its pleadings, but must show that specific, material facts exist to create a genuine, triable issue. Celotex, 477 U.S. at 324. A "scintilla" of evidence in favor of the non-moving party, however, is insufficient to prevent an award of summary judgment. Anderson, 477 U.S. at 252. Further, "mere speculation" by the non-moving party or the "building of one inference upon another" cannot create a genuine issue of material fact. Cox v. Cnty. of Prince William, 249 F.3d 295, 299-300 (4th Cir. 2001). Summary judgment should be denied only where a court concludes that a reasonable factfinder could find in favor of the non-moving party. Anderson, 477 U.S. at 252.

## III.   **DISCUSSION**

Defendant moves for summary judgment, asserting that plaintiff cannot establish a prima facie case of negligence because plaintiff fails to present evidence that defendant (1) breached a

4

duty of care and (2) that defendant's alleged negligence proximately caused plaintiff's alleged injuries.[2]  (ECF No. 31 at 6-16).  To assert a claim of negligence in Maryland, plaintiff must prove that: (1) the defendant was under a duty to protect plaintiff from injury, (2) the defendant breached that duty, (3) plaintiff suffered actual injury or loss, and (4) the injury or loss proximately resulted from defendant's breach of duty.  100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co., 430 Md. 197, 212-13, 60 A.3d 1, 10 (2013).  As a customer at an ice skating facility maintained by defendant, plaintiff was a business invitee to whom defendant owed a duty to "use reasonable and ordinary care to keep the premises safe . . . and to protect [her] from injury caused by an unreasonable risk that [she], exercising ordinary care for [her] own safety, [would] not discover." Henley v. Prince George's Cnty., 503 A.2d 1333, 1343 (Md. 1986).  "[N]o presumption of negligence on the part of the proprietor," however, "arises merely from a showing that an injury was sustained [at the facility]."  Garner v. Supervalu, Inc., 396 Fed. App'x 27, 29 (4th Cir. 2010). Maryland courts have emphasized that a proprietor is "not an insurer of the safety of his customers," Moulden v. Greenbelt Consumer Servs., Inc., 210 A.2d 724, 725 (Md. 1965), and have held that it would be unreasonable to impose a duty on a proprietor to continuously inspect the premises.  See, e.g., Lexington Mkt. Auth. v. Zappala, 233 Md. 444, 446, 197 A.2d 147, 148

---

[2] As a preliminary matter, the FTCA governs this case because BSC's employees were acting within the scope of their employment with defendant during the relevant time period.  28 U.S.C. § 1346(b)(1) ("[T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . [for] personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.").  Here, all alleged acts occurred on the grounds of the United States Naval Academy in Annapolis, Maryland.  (ECF No. 1 at 3 ¶ 11).  The court, therefore, must apply Maryland law to plaintiff's substantive claims.  See Coleman v. United States, No. SKG-07-1711, 2008 WL 11363710, *4 n.6 (D. Md. Dec. 2, 2008) (noting that under the FTCA, the law of the place where the act occurred governs) (citing 28 U.S.C. § 1346(b)(1)).

(Md. 1964) (commercial business owner did not breach duty of care by failing to instantaneously detect and correct dangerous condition of oil or grease on parking garage floor which allegedly caused customer to fall).  Accordingly, "the burden is upon the customer to show that the proprietor created the dangerous condition or had actual or constructive knowledge of its existence."  Id.

### A.  **Breach**

Defendant argues that there is "little evidence supporting the existence of a hazard."  (ECF No. 31 at 6).  Specifically, defendant contends that the facts of this case are "strikingly similar" to Myers v. TGI Friday's, Inc., No. JFM-07-333, 2007 WL 4097498 (D. Md. Nov. 9, 2007).  In Myers, plaintiff alleged that she slipped and fell on the floor of the defendant's restaurant but did not observe what caused her fall or see any substance on the floor before or after her fall, although she said the floor "felt slippery."  2007 WL 4097498, at *1.  In addition, none of the defendant's employees observed anything on the floor that could have caused the fall.  Id. at *4.  While the court in Myers ultimately granted summary judgment for the defendant, the court nevertheless assumed that a dangerous condition existed as plaintiff had alleged.  Id. at *6.

In this case, although neither plaintiff nor defendant's employee, Mr. Woolums, observed any defects in the ice before or after plaintiff fell (ECF Nos. 31-1 at 4-6, 31-3 at 9-10), plaintiff's son testified during his deposition that he observed a 4"x1" divot in the ice after plaintiff's fall (ECF No. 31-2 at 5).  In addition, this case is distinguishable from Myers because the plaintiff in that case was wearing heeled shoes and consumed alcohol prior to her fall, which the court noted could have caused her fall.  2007 WL 4097498, at *6.  Here, viewing the facts in the light most favorable to plaintiff, there is clearly evidence that a dangerous condition existed in the ice.  See id.

Next, defendant argues that, assuming the alleged divot constituted a dangerous condition, defendant did not create the divot or have actual or constructive knowledge of it and, therefore, did not breach its duty of care to plaintiff.  (ECF No. 31 at 8).  The court agrees with defendant that there is no evidence that defendant created or had actual knowledge of the divot.  As defendant notes, there were no reports by other patrons of a divot or any other defects in the ice.  (Id. at 12).  In addition, deposition testimony by defendant's employees indicate that they were not aware of any dangerous condition before plaintiff's fall, and even after inspecting the ice following plaintiff's fall, defendant's employees did not observe any dangerous condition, and no repairs of the ice were needed.  (ECF Nos. 38-3 at 7-8, 38-4 at 6-7).  Further, other patrons continued to skate on the ice after plaintiff's fall "without issue."  (ECF No. 31-4 at 1).  Plaintiff, therefore, fails to meet her burden of generating a genuine issue of material fact as to whether defendant created or had actual knowledge of the divot in the ice.

There is evidence, however, that defendant had constructive knowledge of the divot that allegedly caused plaintiff to fall.  A plaintiff may establish constructive knowledge if the plaintiff shows that the hazardous condition existed for a sufficient period of time for a proprietor to discover the defect and remedy it prior to plaintiff's injury.  Deering Woods Condo. Ass'n v. Spoon, 377 Md. 250, 267-68, 833 A.2d 17, 26-27 (Md. 2003) ("[I]f it is shown that the conditions have existed for a time sufficient to permit one, under a duty to know of them, to discover them, had he exercised reasonable care, his failure to discover them may in itself be evidence of negligence sufficient to charge him with knowledge of them.") (quoting Moore v. Am. Stores Co., 169 Md. 541, 182 A. 436, 440 (1936)).  Maryland courts refer to this type of evidence as "time on the floor" evidence.  See Saunders v. Wal-Mart Stores, Inc., JKS-09-2330, 2010 WL 1416542, at *3 (D. Md. Apr. 5, 2010) (citing Joseph v. Bozzuto Mgmt. Co., 173 Md. App. 305, 315-316, 918

7

A.2d 1230, 1236 (Md. Ct. Spec. App. 2007)).  Evidence of "the size or nature of the [hazard] is not a substitute for 'time on the floor' evidence." Id. at *4.  Rather, the court looks to the circumstances surrounding plaintiff's incident.  Deering Woods, 377 Md. at 264, 833 A.2d at 24-25 ("What will amount to sufficient time depends upon the circumstances of the particular case, and involves consideration of the nature of the danger, the number of persons likely to be affected by it, the diligence required to discover or prevent it, opportunities and means of knowledge, the foresight which a person of ordinary care and prudence would be expected to exercise under the circumstances, and the foreseeable consequences of the conditions.") (quoting Moore, 169 Md. 541, 182 A. at 440).

In this case, defendant contends that there is no evidence of how long the alleged divot in the ice existed.  (ECF No. 31 at 10).  Contrary to defendant's position, however, there is evidence that the divot was created during the Learn to Skate program, which occurred on the ice between 2:00 and 4:30 p.m. on the day of the incident, at least one hour prior to plaintiff's fall.  (ECF No. 37-6 at 8, 26).  Plaintiff's expert, Lisa Fedick ("Ms. Fedick") testified during her deposition that she believes the divot was created by a freestyle skater's misplaced toe pick while practicing a toe jump during the Learn to Skate program.  (Id.)  In support of her opinion, Ms. Fedick cited to a Learn to Skate USA curriculum, which she notes defendant would have used during the Learn to Skate program on the day of plaintiff's fall because the class was a licensed skating program.  (Id. at 20).  Specifically, Ms. Fedick suggests that the type of maneuvers performed during the Learn to Skate program—based on the Learn to Skate USA curriculum—caused the divot in the ice. (ECF No. 31-8 at 8).  Ms. Fedick further notes that the dimensions of the divot, as described by plaintiff's son, are consistent with her opinion that the divot was created by a skater's misplaced toe pick while practicing a toe jump during the Learn to Skate program.  (ECF No. 37-6 at 26).

While there is no video evidence or witness testimony showing exactly what kinds of jumps were performed during the Learn to Skate program on the day of plaintiff's fall, defendant fails to provide any conflicting evidence indicating that toe jumps, as described by Ms. Fedick, did not occur during the Learn to Skate program.  Similarly, defendant does not dispute Ms. Fedick's assertion that defendant followed the Learn to Skate USA curriculum during the Learn to Skate program.  Ms. Fedick's expert report and related testimony, therefore, provide evidence from which a factfinder could reasonably infer that the divot was caused by a skater during the Learn to Skate program—which occurred from 2:00 to 4:30 p.m. on the day of the incident— and, therefore, that the divot existed in the ice for at least one hour prior to plaintiff's fall.

        In addition, there are genuine factual disputes regarding defendant's resurfacing of the ice at 4:30 p.m. and the presence of skate guards on the ice on the day of plaintiff's fall.  With respect to defendant's resurfacing of the ice at 4:30 p.m., as plaintiff notes, there is no log entry in defendant's Resurfacer Log—which maintains a record of each time defendant "resurfaces" or cleans the ice—although there are log entries at 8:20 a.m., 9:50 a.m., 12:10 p.m., 1:35 p.m., 6:30 p.m., 7:55 p.m., and 9:48 p.m. on the day of plaintiff's fall.  (ECF No. 37 at 19).  Defendant, however, notes testimony from two employees who say that the ice was resurfaced at 4:30 p.m., prior to plaintiff's fall, despite the omission of a log entry for that time.  (ECF No. 31 at 11 n.1).  Based on this conflicting evidence, a factfinder could reasonably conclude that defendant failed to resurface the ice at 4:30 p.m., and that had defendant resurfaced the ice at that time, defendant would have discovered the divot and repaired it in time to prevent plaintiff's alleged injuries.[3]

---

[3] On this point, Ms. Fedick noted in her expert report that "[h]ad the ice been resurfaced [at 4:30 p.m.] . . . it is probable that the dangerous condition to which [plaintiff] succumbed would have been corrected before she arrived to skate with her family."  (ECF No. 31-8 at 13).  Ms. Fedick also testified that an ice resurfacing "correct[s] a surface once there's been a busy session" on the ice.  (ECF No. 37-6 at 26).

With respect to the presence of skate guards on the ice, defendant argues that two employees were assigned as skate guards (i.e., employees responsible for monitoring ice conditions for any potential hazards) on the day of the incident, and they ensured that ice conditions were continuously inspected during the public skate session. (ECF No. 31 at 11-12). Contrary to defendant's position, however, plaintiff contends that there were no skate guards on the ice prior to her fall. (ECF No. 37 at 23-25). Specifically, plaintiff notes that she, her boyfriend, and her son, all of whom skated during the public skate session, did not observe any skate guards on the ice. (ECF Nos. 37-1 at 5, 37-2 at 20, 37-13 at 10). While the parties do not appear to dispute that employees were assigned as skate guards on the day of the incident (ECF No. 37-9 at 30), it is not clear whether the skate guards were on the ice prior to plaintiff's fall or if they inspected the conditions of the ice during the relevant period. Accordingly, based on the evidence presented by plaintiff, a factfinder could reasonably conclude that had skate guards been present on the ice prior to plaintiff's fall, they would have discovered the divot and repaired it in time to prevent plaintiff's alleged injuries.[4] In sum, given the evidence discussed above with respect to the Learn to Skate program, as well as the parties' conflicting evidence regarding the resurfacing of the ice at 4:30 p.m. and the presence of skate guards on the ice prior to plaintiff's fall, there is clearly a genuine

---

[4] Defendant further contends that "there is no justifiable inference [defendant's] failure to discover the alleged divot could be found to constitute negligence" because plaintiff's son, the only person of record who observed the divot, was only able to see the divot when he "got down on [his] knees close to the ice." (ECF No. 38 at 18). As noted by defendant's manager-on-duty on the day of plaintiff's fall, however, there is no evidence that plaintiff's son was trained to notice divots, as were the skate guards. (See ECF No. 37-8 at 43-44). Accordingly, whether defendant could have discovered the divot in the ice through the exercise of ordinary care is a factual dispute for a factfinder to resolve.

dispute of material fact as to whether defendant had constructive knowledge of the divot.[5] Accordingly, there is no basis for summary judgment on this issue.

**B.  Proximate Causation**

Next, defendant contends that plaintiff fails to present sufficient evidence of causation. (ECF No. 31 at 12-16).  In addition to showing a duty, breach, and actual injury or loss, plaintiff must also prove that her injury proximately resulted from defendant's breach of duty.  100 Inv. Ltd. P'ship, 430 Md. at 212-13, 60 A.3d at 10.  Defendant asserts that there is no evidence showing when or how the alleged divot was created, and that the existence of the alleged divot is explainable by causes beyond defendant's control.  (Id. at 13-15).  Specifically, defendant asserts that "it is just as likely another skater created the alleged divot moments before [plaintiff] fell . . . [or that plaintiff] caused the divot when she tripped over her own toe pick."  (Id. at 13).  Plaintiff, however, argues that Ms. Fedick's expert report and deposition testimony support plaintiff's position that the divot was created by a freestyle skater during the Learn to Skate program and not by another skater during the public skate session moments before plaintiff's fall.  (ECF No. 37 at 25-28).  Specifically, plaintiff notes that Ms. Fedick based her conclusion with respect to causation on the dimensions of the divot, the type of jumps that typically cause such a divot, and the fact that it was unlikely that the divot was created during the public skate session given the large number

---

[5] Further, defendant compares this case to Ronk v. Corner Kick, 850 F. Supp. 369 (D. Md. 1994). (ECF No. 31 at 10).  In Ronk, the plaintiff brought a negligence claim against the defendant when he slipped on water on the floor of the defendant's racquetball court.  850 F. Supp. at 369.  The court held that the defendant did not have constructive knowledge of the water on the floor, noting that the plaintiff cited no evidence as to how long the water was on the floor.  Id. at 371.  Here, however, as discussed above, plaintiff's expert presents evidence from which a factfinder could reasonably infer that the divot was created sometime during the Learn to Skate program and, therefore, had been on the ice for at least one hour prior to plaintiff's fall.

of skaters on the ice at the time.[6]  (Id.)  While it is far from clear whether plaintiff will be able to sustain her burden of proving causation at trial, it is clear based on the parties' conflicting evidence that a genuine dispute of material fact exists as to causation.[7]  Accordingly, there is no basis for summary judgment on this issue.

### C.  Assumption of Risk

Finally, defendant contends that plaintiff assumed the risk of injury while ice skating. (ECF No. 31 at 16-17).  Assumption of the risk is a complete bar to a plaintiff's recovery pursuant to Maryland law.  Dell v. DeTar,  No. JFM-16-00887, 2017 WL 3835679, at *6 (D. Md. 2017) (citing ADM P'ship v. Martin, 348 Md. 84, 91, 702 A.2d 730, 734 (1997)).  A defendant may prove assumption of risk by showing that the plaintiff (1) had knowledge of the risk of the danger, (2) appreciated that risk, and (3) voluntarily confronted the risk of danger.  ADM P'ship, 348 Md. at 90-91, 702 A.2d at 734.  The issue of assumption of risk may be decided as a matter of law "if there are no facts in dispute and if a person of normal intelligence, in the same position as the plaintiff, would clearly have comprehended the danger."  Dell, 2017 WL 3835679, at *6 (citations and quotation marks omitted).  "[H]owever, the question of whether the plaintiff assumed the risk of harm is ordinarily reserved for [the factfinder]."  Id.

In this case, defendant maintains that plaintiff was an "experienced" skater who "knew and fully appreciated the dangers inherent to ice skating," and that the alleged divot did not exceed the

---

[6] As noted by Ms. Fedick during her deposition testimony, it was against defendant's rules for skaters to perform freestyle or toe jumps during the public skate session.  (ECF No. 37-6 at 9).

[7] Moreover, with respect to defendant's theory that plaintiff caused the divot, defendant provides testimony from an employee who says plaintiff told him that she fell because she "tripped over the toe pick."  (ECF No. 31 at 4).  Plaintiff, however, testified during her deposition that she never told anyone that she tripped over her own toe pick.  (ECF No. 37-2 at 21).  In addition, Ben Neumann, defendant's facilities manager, testified during his deposition that when his employees approached plaintiff after her fall, they tried to establish how the fall occurred but "couldn't get an answer from [plaintiff] of what exactly was the cause of her fall."  (ECF No. 37-4 at 70).

usual dangers inherent to ice skating.  (ECF No. 31 at 16-17).  Contrary to defendant's position, plaintiff argues that she did not have knowledge or appreciate the risk of danger because she never saw the divot in the ice, either before or after her fall and, while she knew how to skate, she was not trained like the skate guards employed by defendant to spot defects in the ice.  (ECF No. 37 at 28-30).  Although defendant notes that it posted a "McMullen Hockey Arena Code of Conduct and Assumption of the Risk Agreement" sign throughout the facility (ECF No. 38 at 18), plaintiff argues that she did not recall observing the sign (ECF No. 37 at 3), and that she "did not voluntarily consent to a non-resurfaced skate session" or "to skating on ice with dangerous crevices in it" (id. at 32).  Accordingly, there is no basis for summary judgment on the issue of assumption of the risk.

IV.   **CONCLUSION**

For the foregoing reasons, defendant's Motion for Summary Judgment (ECF No. 30) is DENIED.  A separate order will be issued.


June 1, 2022                                   _____/s/_____
                                               Beth P. Gesner
                                               Chief United States Magistrate Judge